The case this afternoon is 23-2171, United Services Automobile Association v. PNC Bank. Ms. Glasser. Your Honor, may I have a moment to get my water? Sure. Thank you. Good afternoon, and may it please the Court. There are several reversible errors discussed in the briefing, time permitting, and if your Honors have questions, we'll discuss them all. To get this resolved, I'd like to focus first on the issues that relate to the element that requires duplicate detection, a specific type of error checking, and it requires it using the electronic image taken of the check. Do you agree that that claim limitation means just using it for one purpose, not using it for all purposes? It needs to use the image specifically for the duplicate detection, Your Honor. One aspect of duplicate detection, or the entirety of the duplicate detection. Well, duplicate detection, Your Honor, as described in the combination reference, was taking all of the information from the- Okay, but you're not really answering my question. This is an important claim construction which the parties sort of don't discuss, and what PNC says is you have this limitation satisfied because the check amount, for example, is determined from the electronic image. Are you saying that all information necessary for duplicate detection has to come from the electronic image, or is it sufficient that there is one aspect, one piece of information from the electronic thing that's used? I understand your question, Your Honor. So the theory presented by PNC was that you need to use either the signature from the image, and we're- Answer my question about the claim construction. It does not have to be that you're using every nook and cranny of the check image. Just one feature. As long as you are using- One feature is enough. As long as you're using- Yes, no. A feature of the check image itself. Yes. The actual image, Your Honor. One feature of the check image, yes, okay. And it needs to be within the check image itself. And so the theory that PNC presented, Your Honor, was that that could be the signature. There's a debate between the parties- No, that was one thing, but I don't read the petition that's exclusively reliant on that. There are only two things that are mentioned anywhere in the briefing before the board or this court, and those are the signature, and in the briefing before this court, and the final written decision itself, there is a reference to the micro line. And I think, Your Honor, this may end up being a distinction without a difference. I think it is important to be precise, but whether you're talking about the signature only, which I think was the only theory presented, or whether you're also talking about the micro- No, I don't understand that to be their theory. Their theory is that there are numerous pieces of information here. Check amount is one, which is found both in Garcia and Sinfield. So, Your Honor, the check amount was not argued by PNC or the board to be used from the check image. Well, let's assume that we disagree with you, and we'd say that they did argue check amount. Is that sufficient? I'll go to that in a moment, but I do think this is very- No, no, no. Answer my question. Is that sufficient? Would you be able to perform a duplicate detection using only the amount? I don't think so, Your Honor. If they, in fact, argued the check amount could be secured from the image, and that that was a feature of duplicate detection, would that be sufficient to satisfy the claim limitation, to find that the prior art satisfied the claim limitation? I don't think you could perform a duplicate detection using just the inputted check amount, Your Honor. I don't think that would be possible. That was the purpose of my question about the claim instruction. You agreed it doesn't have to be the entirety. It is one feature. The check amount is one feature for duplicate detection. And I'm saying, let's assume the check amount is in the prior art, in Garcia, let's say, and that they argued, which I know you dispute, the check amount was shown by Garcia that that's sufficient. What's wrong with that argument? So the Singfield reference that was being combined, and this is from the final written decision, uses all of the information on the check, the check number, the check amount, the routing and account number, and the signature. And so that's the teaching that PNC was suggesting to be incorporated into Garcia. So what if it taught all those things? You agree it only has to teach one of those things, right? No, Your Honor. PNC's theory was that you would take the duplicate detection. Forget about PNC's theory. You agree that if they used one feature, check amount, that would satisfy the claim limitation. I don't think so, Your Honor. No, why not? And that certainly wasn't the theory presented by PNC or adopted by them. Forget about whether it was a theory. Is that sufficient? If I understand your question, Your Honor, I don't think so. Why? Well, first of all, the Board specifically found that the one thing that is always input by the user is the check amount. This is from the final written decision at page 32, appendix 80. The Board itself specifically found that this isn't just the preferred embodiment. This is the finding about what Garcia does. They capture a digital image. You're not answering my question. I'm sorry. My question is, if the prior art disclosed check amount, and check amount is one thing that's used for duplicate detection, why isn't that sufficient finding that the prior art discloses this limitation? So if hypothetically there were a prior art reference that obtained the check amount from the check image itself and taught using that for duplicate detection, and there were a motivation to combine that and some reason to think it would work, I think in theory, Your Honor, that that could work. That's not the theory that we have here, of course. The question here was whether or not someone would have been motivated to take the teaching of Singfield, which uses a specialized check feeder and unique scanner, to take the teaching of Singfield that says, doing that, we can obtain all the information from the check. Again, check number, check amount, routing, signature. This is from Singfield itself in the final written decision. And could we then use that with a reasonable expectation of success when we're just snapping the photo from Garcia? Now, this is not a debate, Your Honors, about whether or not somebody could put forth some reasoning to support that. We don't think they could. But what we're focused on here today is that the board literally did not consider that issue. There was absolutely no evidence presented or discussed by the board or considered about whether the quality of the image taken from Garcia from the cell phone would have been perceived by a POSA to be of sufficient quality to be actually usable, not just for some sort of mobile deposit, but for actually performing this duplicate detection approach. This was obviously not the patent owner's burden. So from our perspective, the inquiry should end here. But however, we do have a unique circumstance here where the patent owner itself actually put in, including in the patent owner response, detailed evidence about why a POSA would not expect that the quality of the image would be sufficient for duplicate detection, which is not just depositing a check somehow, some way. It's actually checking to see if that exact check has been deposited before. You can't just look at the amount, for example. People all the time have multiple checks with the same amount. And the patent owner put in evidence, which was through our own expert as well as PNC's district court expert, that said there's all kinds of issues with this. There's skew and there's angle. And even being off by 2% to 3% is going to cause a problem. So you might have a case where the board looked at that or PNC argued and said, well, that's OK. It still would have been worth it to make this. But that's not what happened. The board literally did not discuss any of this evidence at all. The word skew doesn't even appear in the board's decision. The board made absolutely no findings, simply ignored the question. And there was no evidence from PNC. And as I was preparing this, I was thinking people come before your honors all the time and say, there's no evidence, Your Honor. And how do you prove that? You're proving a negative, right? But here we actually have a pretty good hook to show you. This isn't just me saying this. PNC's expert actually testified. This is at Appendix 5014. He was asked, well, what do you know about this type of image that's being taken? He didn't even remember what the difference was. He didn't remember what type of imaging was going on in Singfield, what type of imaging was going in Garcia. And he actually said all he was relying on Singfield for was the general idea of duplicate detection. He didn't even go to the analysis of saying duplicate detection using the image and then take the final step of saying, OK, how are we going to deal with the fact that a POSA would have perceived that when you're trying to do something really precise, like checking whether it's the exact same check that was deposited before, the POSA expects that there's all kinds of issues with the skew and the angle. The board, again, literally, they didn't disagree with what I'm saying now. They just literally completely ignored it. And the only, in fact, elsewhere in the decision, the board actually acknowledged the fact, this is at Appendix 102, they actually acknowledged the fact that an image obtained from a camera phone was materially different, that it was unpredictable, that existing algorithms were not able to reliably correct for it. They said that. And then they did nothing with it. The only findings they made is that you could look at Garcia and, according to the board, believe that a check deposit would work. And then that you could assume people would want to avoid duplicate checks. But that's not what the combination is. The claim element specifically requires that you would use the image that was taken, and you would use that image itself, at least in part, to perform a check to see if there was a duplicate deposit. The board didn't make that analysis. The board just didn't address that issue whatsoever. And then to make matters worse, the board then went ahead and excluded some of the other evidence from the patent owner relating to the fact that PNC's primary theory, which had to do with the signature algorithm, didn't work at all. That this had nothing to do with comparing signatures on a check. It was some algorithm to determine whether you had two images that were the same. They didn't address that evidence. They simply threw all of that evidence out. And they seemed to proceed on the notion that skew was not raised in the patent owner response. Your Honor, skew is raised explicitly in detail in the patent owner's response. And that was simply an extreme error on the part of the board to just ignore that evidence and then to also ignore its own factual determination that there were indeed significant issues with skew in the art. To do all of that and then to proceed to not determine whether there was a reasonable expectation of success with respect to the actual combination that was at issue here, Your Honors. So unless Your Honors would like to address the burn combination as well, I would reserve the rest of my time for rebuttal. Okay. Thank you. Mr. Lanthier. Thank you, Your Honor. May it please the court, Greg Lanthier on behalf of PNC Bank. Your Honor, briefly I'd like to address the argument that Ms. Glasser was making on behalf of USAA, which has to do with the requirement in the claims that there be a duplicate detection that is performed. And as Your Honors know, the basis for the combination there was combining Garcia and burn with the Singfield reference. Ms. Glasser, I think, tried to persuade Your Honors that there was only one basis on which PNC argued that combination and that there was only one basis on which the board found that that limitation was disclosed. But in fact, there were three different bases on which the board relied to find that PNC had made its burden out. And I think, Your Honor, Judge Dyke, I think you've sort of alluded to this somewhat. But the first basis that the board relied on was that in the combination, Garcia's server was already extracting the information from the front of the check, which would include the MICR line, which has the routing number, the account number, and the check number on it. And it would feed that to Singfield's system. So all the Singfield reference would be doing is intaking that information and comparing it against the information it already had for deposited checks. And we didn't hear any argument about that. That's at the appendix, pages 85 to 86. It was in our petition at appendix pages 266 to 269, as well as 277. And it's clearly supported by substantial evidence. A second basis on which the board found that this limitation was taught by the combination is at appendix pages 84 to 85, where it points to Singfield. This is appendix page 1101 at paragraphs 24 and 25, and says, We read Singfield. The most reasonable reading of Singfield is that Singfield itself is using the check information, and they provided that as an alternative reason for finding that it was taught. The third reason is the one that you heard about from USAA, which is the board then went on to say, and even if it weren't true that Garcia were already getting the OCR information and could feed it to Singfield's system, and that Singfield itself doesn't disclose using the check image in full, well, at least Singfield is teaching that the signature is used for duplicate detection. That couldn't be obtained by OCR, because you wouldn't want to actually reduce the signature down to just the words of the signature, and that's at appendix pages 83 to 84. That finding is also supported by substantial evidence, Your Honor, but I just think it's important to note that it's one of three alternative bases on which the board found that that limitation was taught. The entire argument that USAA is making hinges on this idea that Garcia doesn't teach OCR of the information off the face of the check. I just want to point out that at appendix pages 99 and 100, the board explains why, quote, the most reasonable read of Garcia is that it suggests optically extracting check information, such as information from the MICR line like the routing and account numbers using OCR. That's certainly supported by substantial evidence. And then the third point I wanted to make, Your Honors, is there was a suggestion that at appendix page 102, the board made some factual findings about the usability of images captured by a check. I'm sorry, captured by a mobile device. I don't see that on appendix page 102. What I see on appendix page 102 is a summary followed by a rejection of USAA's arguments. And in fact, in the final written decision that the board is very clear that the Garcia reference demonstrates that a check captured by a mobile device would be sufficient for OCR and deposit. So I think it runs actually directly against what USAA's argument is here. So unless Your Honors have additional questions on the substantial evidence supporting the board's findings of invalidity as to claims 1 and 8 through 20, I'd like to jump now right to PNC's cross appeal on claims 2 through 7, which the board determined not to cancel. And if Your Honors would turn to appendix page 151, you'll see what claim 2 is. And all that claim 2 adds to independent claim 1 is that the system performed error processing before the check is deposited. It doesn't say how. It doesn't say where. All it says is that you do it. And error processing is, for example, and this is undisputed, just looking to see whether somebody remembered to endorse the check or not. So the question here is whether in a check deposit system in 2006, it would have been non-obvious to think, to look to see, for example, if there's an endorsement on the check before it's submitted for deposit. And I think there are four specific errors in the board's analysis when it comes to claim 2 that merit a reversal, or at least vacatur and remand as to that part of the board's decision. And the first is that the board had already found in connection with claim 1 that a person of skill in the art had reason to combine the Garcia reference and the Byrne reference. It already found for many reasons that that combination would have been made because Garcia disclosed that it used a computer application but didn't teach how the device got the computer application. And Byrne taught a downloadable thin client that had certain advantages and benefits that a person of skill in the art would have found motivated the combination. So we've already combined Byrne and Garcia. It's undisputed that at paragraph 175 of Byrne, this error processing is taught. So it's an error for the board to require an additional motivation to combine in that scenario. The board has already found for claim 1 that these references will be combined. Byrne already teaches. I'm not sure about that. What case says that? If you combine it for one purpose, do you necessarily combine it for another purpose? It's not for different purposes, Your Honor. I think that would be a different scenario. This isn't a different purpose. Byrne discloses a downloadable thin client for check deposit. And the board has already determined that it would be obvious to incorporate Byrne into Garcia and Byrne's check deposit software specifically. That check deposit software already has error processing. But I don't think when the board says it will combine it for one claim limitation, that they're necessarily suggesting that it would combine it because the combination has to be assumed for another claim limitation. I think that that is the analysis the board applied, and I think that it's incorrect, Your Honor. I would point you, if you ask for a case, the General Electric versus Raytheon case from 2020 that we cite in our brief. There's a portion on the pages we cite, but we don't have this. Tom, the clock is running. So can I just move you forward? You said you had several arguments. I mean, the one I was a little confused by the briefing because so much of your briefing in this regard had to do with proving that the board misconstrued the shift thing. Yes, Your Honor. But let's take that off the table for a minute and just get to the heart of the case, which is, was there a motivation, and did you satisfy your burden to establish the motivation? Because at the end of the day, I think it was short. But what they said is, you didn't put on enough evidence. You didn't satisfy your burden to show there would – so you have a response to that, I assume. Yes, Your Honor. So why don't you deal with that issue? I will, Your Honor. So I would say, first off, the point I just made, which I won't go into again, I think there doesn't need to be an additional motivation to combine when there's already been a showing there. That said, we did put forth additional evidence of a motivation to combine specific to Claim 2, which, as Your Honor points out, the board rejected. And I think even if you were to accept the board's factual findings, there's still legal error in the board's findings as to Claim 2 because what the board imposed on us was an obligation to show that having error processing occur at the user device, which is indisputably taught in Byrne, was more desirable than having it occur at the server. Well, they talked about the shift from the server. And there's no shift. Which is what was done in Garcia, right? Not exactly, Your Honor. Garcia teaches that verification is performed at the server. Garcia does not talk about error processing specifically. The only reference that talks about error processing specifically is Byrne. The board said that Garcia showed error processing occurring on the bank server. And they're saying, the board is saying, as I read the decision, that shifting that to the mobile phone was not shown to be sufficiently motivated. So I don't think the board found that there was error processing taught in Garcia at the server, Your Honor. What the board said was, if anything, Garcia suggests doing the error processing at the server. Didn't find that it was taught. Byrne does teach doing it at the device. So what was your evidence? What was your evidence that it would be desirable to have on the mobile phone error processing? What was the testimony about that? Yes, Your Honor. In the petition supported by the expert testimony, we pointed out that in 2006, this system would have been run over a 2G or possibly a 3G network. So there would be a premium on not sending a large file, which a check image would be, across that network if it was going to be pointless. Because there was a simple mistake in it that could have been caught at the mobile device. There was an advantage for doing it on the mobile phone instead of the server. That is correct, Your Honor. And the board said about that, that I'm not clear what the board said on the one hand. Because consuming excessive bandwidth or incurring excessive delay, sort of like, everybody could say that about anything. And that's the mistake, I think, Your Honor, which is that, yes, it's a universal motivation, and we don't deny that. We never said it was a specific motivation. But we're talking about a wireless system to deposit a check using the image. And it would motivate any person of skill in the art to think about, what can I do to avoid sending images that don't need to send? You need error processing on the phone before sending the image. Exactly, Your Honor. That's exactly what the petition said. So what do you read? And I read the board as saying, we need something more. So what do you understand the more to be that the board required? An expert saying? Do you think the board wasn't buying the fact that this would fix the delay stuff? Or that the board was just not buying that some expert didn't confirm that? I think there are two things that the board was saying, both of which are wrong, Your Honor. I think in one paragraph, and I believe this is Appendix 108, it may be 109, but the board points to the testimony of our expert, Dr. Mowry, that there would have been tradeoffs in between doing it on the one place or the other, and says, well, he said there were tradeoffs. Clearly, the fact that there's tradeoffs is not a reason to find something not on the appendix. Where do they say this? I believe it's Appendix 109, Your Honor. But let me make sure I get you the right citation. It's the first full paragraph on Appendix 109, Your Honor. And then the second thing that they say, Dr. Mowry's trial testimony casts further doubt on petitioner's rationale for this claim. Dr. Mowry testifies that conserving bandwidth would potentially have been one of the goals of the ordinary artisan, depending on how precious the resources is. And then if you read down, they focus on his testimony. They quote it, saying that there are tradeoffs in between doing it on the server versus doing it on a mobile device. And Your Honors have many cases saying the fact that there are tradeoffs doesn't mean that something's not obvious. And then I think the second thing that the board was requiring of us that was erroneous, Judge Prost, is they seem to be saying we had to put in specific data about how much bandwidth would be saved. And they have that finding that, well, you put that in your reply, but it's too late. Where do they say that? That would be, that's on Appendix Page 110. And it's at the tail end of the first paragraph, which carries over from Appendix Page 109. And they say, in its reply, Petitioner cites testimony from Dr. Mowry, but it simply compares the size of a compressed image with the size of a large application, and this comes too late, and they determine not to consider it. For obviousness, we don't have the burden of providing more than the motivation, which was clearly in the petition, which talked specifically about the 2G and 3G networks, and that there would have been a reason for a person of skill in the art to do this in order not to transmit images that didn't have to be transmitted on those networks. Well, at the bottom of Pet 108, they say, for example, Dr. Mowry did not testify that an ordinary artisan would have expected Garcia's system to consume excessive bandwidth or incur excessive delay. Yes, Your Honor. So were they saying it was something, but it needed to be excessive? There they seem to be saying that unless we showed that Garcia was more resource-constrained than your average wireless network, then this universal motivation to avoid sending things across the network that you didn't need to was not persuasive. But that's exactly contrary to your Honor's decisional law, which says that a universal motivation is still a motivation. You don't discount something because we didn't show that it was especially problematic for this system as compared to other systems. Well, I guess unless it's a teaching away, right? Unless it's a teaching away, exactly, Your Honor. And there's no teaching away finding in the Board's analysis whatsoever. And I think, again, Your Honor, we have to remember what this limitation is. This is a limitation that says, before you deposit the check, take a look to see if somebody forgot to sign it or endorse it. This is not something that would be non-obvious in the year 2006 in a check deposit system. And the Board got the analysis wrong, and that part of the Board's final written decision should be reversed. And the Board dealt with it. They dealt with dependent claim two and then the others separately. But is there any distinction that you want to make between the analysis with regard to claim two and the other dependent claims? No, Your Honor, the Board didn't make any distinction. It did have a section on dependent claims three through seven. It said, well, we've already ruled on claim two, and so they didn't make separate findings there. Unless I know I'm over time, Your Honor. I'm sorry, Judge Cunningham. Yes. So a couple of questions. First question is just following up on the point that you made towards the beginning of your argument about if you submit and show what they should have gone for, essentially the independent claims, there didn't need to be an additional showing with respect to the dependent claims. At least that's the way I heard it. What is your case law support for that, if that is what you intended first? Your Honor, General Electric v. Raytheon, 983 F. 3rd, 1334 at 1351 to 52. This is a case that we did cite in our briefing and those pages. We did not cite this particular language. But there it says that the Board's decision misunderstands the requirement to show obviousness of the claim as a whole. I'll skip some of it. The law has always evaluated the motivation to combine elements based on the combination of prior references that together disclose all of the elements of the invention. And then the Board goes on to say, because here the Board was requiring a specific motivation for each limitation of the claim. It says, in contrast, the Board's approach would require a motivation to combine each element of the claim, even those present together in a reference. This analysis unduly dissects prior art references into collections of individual elements, requiring a party showing obviousness to redo the work already done in the prior art reference. The claimed invention and an invention in the prior art must both be analyzed as a whole for the same reason. An invention is more than the sum of its individual elements. I'm sorry, Judge Cunningham, if I could just insert myself, because I'm really confused by what you're saying. Are you saying that as a matter of law, if the Board finds a motivation for a combination with respect to the independent claims, it can't divert for that in any circumstances when analyzing the dependent claims? No, Your Honor. Okay. What I'm saying is that if the Board has found on an independent claim a motivation to pull or to combine something from one reference with something from another reference, so here it would be the downloaded thin client in Bern that the Board found there was motivation to combine with Garcia's check deposit system, that if Bern's description of that downloaded thin client software already includes what the dependent claim requires, you don't start over from scratch and say, let's just look at what that dependent claim requires and see if there's a motivation to combine. That's all I'm saying, Your Honor. And certainly there could be cases where maybe there's a teaching away in the references or something else that would be different, but where it's just as straightforward, it already tells you it has this feature and that you've already found that there's motivation to combine that feature with the other piece of prior art, I don't think you have to do a separate analysis.  I mean, it's got to be, if it's a different feature in the dependent claim, then there hasn't been a finding that there's a motivation to include that feature in the combination. I think, Your Honor, that we need to be clear about what we mean by the feature. If you're referring to the feature being the requirement of the dependent claim, then technically that's correct, but if we're looking at it, I think the way the General Electric Court looked at it, which is, no, the feature is the feature from the prior art, then I think that's not correct. To be clear, that in your petition, you made separate and distinct arguments with respect to the motivation to combine with respect to the feature of error correction in Claim 2. That is correct. You didn't rest on the fact that we don't have to do anything more than what we said with respect to the independent claim. That is correct, Your Honor. Sorry, Judge Penningham, but I didn't... I feel like my other question got raised between the collective of my house, so I'm sorry about that. All right, we'll give you one minute on the cross appeal. Thank you, Your Honor. Thank you, Your Honors, and obviously happy to take any questions. Otherwise, I'll speak very briefly. As I think all of Your Honors flagged, the question is whether PNC met its burden to show that the motivation it put forth in the petition, which was a supposed desire to increase bandwidth, to conserve bandwidth in the system, was satisfied. The board here was well within its function. You're talking about the cross appeal now? Absolutely, Your Honor. Okay, I just want to be clear, because you have time on your main appeal. And they were well within their function to find that PNC had not met that burden. PNC's own expert ultimately conceded he didn't know whether the network was bandwidth-constrained at all. He conceded he didn't... Was there any dispute among the experts or the advocates that it would be, in certain circumstances, there would be a delay involved that wouldn't exist if you found the error up front as opposed to later on downstream, that that would be a delay factor? The delay goes in both directions. And so the testimony, including from PNC's own expert, is it wasn't clear whether any bank would even want to implement it this way, whether it would perceive that to be a benefit or not. Of course, you also are having situations either way where you're sending the documents to the bank, and this is simply putting more processing on the system at the outset. And so ultimately, PNC's own expert acknowledged he did not know whether there would be a motivation to actually do it the way they were describing, and he also acknowledged that there would be significant tradeoffs, Your Honors. He said that he didn't see that there would be a motivation to do it. Where did he say that? Yeah, that's correct. His testimony was, I apologize, Your Honor, I lost my pace in my notes. Yes, so this is actually in the final written decision itself, and they're citing the testimony at page 241 of his deposition. He disagreed. What page of the decision is this? 109, I think. Let's see. This is Appendix 109, yes. Okay, and where is the quote he was saying it wouldn't? It says, this is actually the portion that opposing counsel was reading from and then skipped over this piece of it. He, that being Dr. Mowrey, disagreed that in the Garcia system, the motivation would have been to shift it to the client side for verification. Well, that's not saying there was no motivation. Well, he disagreed that that would be the motivation. Absolutely, Your Honor, because remember, their whole theory was that you would start doing it on the mobile phone. I don't read it the way you do, but go ahead. But wasn't that with respect to conserving bandwidth, right? Yes, which was- Not the delay portion. It's the same thing, Your Honor. That was their only motivation, was that you would be conserving bandwidth and therefore delay to the system. Or incur excessive delay. Exactly, Your Honor. So I think they were absolutely well within their function. And in fact, I think we'd probably be here arguing that there was no substantial evidence had they gone the other way, because there really wasn't once PNC's expert basically withdrew his motivation theory. Is that a question of law or a question of fact, though? I mean, don't we have cases, I'm asking, I really, this is a real question, I'm not, that tradeoffs isn't enough? Yes, there are pluses and minuses to doing it one way and not the other, but that's not sufficient to establish that there wasn't a motivation. Don't our cases sort of speak to that? Sure, just the fact that there is some kind of tradeoff, that alone wouldn't be enough. That's not what the Board found here, however. The law, of course, is that you need to analyze the tradeoffs and you need to look at them. PNC, bearing the burden on that issue, didn't even look at any of those issues and ultimately conceded that there certainly were tradeoffs, but the Board didn't primarily rest upon the tradeoffs issue. Okay, so even a concession of tradeoffs doesn't resolve the issue, and if the Board were simply to say no motivation because there were tradeoffs, would that be sufficient as a matter of law? I mean, it would depend what the tradeoffs were, right, Your Honor? Right, but the Board doesn't discuss what those tradeoffs are. The Board actually does go into it a little bit, or at least our evidence was there was problems with battery, there was all kinds of things that were discussed by the expert, but you're correct, Your Honor, that isn't what the Board said. The Board actually said that PNC ultimately didn't come forward with substantial evidence to support that this would have been a concern at all in Garcia, much less that it would have. What evidence do you think the Board would have required, therefore? Everybody concedes there were tradeoffs, so would the petitioner come in and say, well, it's six against seven, or this is more important than this tradeoff, or what? I mean, I honestly don't know the answer to that. I mean, if it came down to the tradeoff issue, that's obviously a heavily fact-dependent issue where we would likely be deferring quite heavily to the Board on their assessment of that issue. Of course, here, tradeoffs— We don't know what their assessment was because they didn't tell us. Well, they did. They talked about the tradeoffs, but I think their primary point was ultimately the PNC expert himself did not actually back up this theory, which was their only theory. Well, but my understanding is that Dr. Mowrey did testify that there would be advantages to doing the error checking on the phone as opposed to on the server, right? He did in his initial declaration, and then ultimately at his deposition, he testified— You're saying he took it back? He essentially did, Your Honor, in testifying. He didn't know—we were supposed to be starting with Garcia. When we were starting with Garcia, he said he actually didn't know whether bandwidth would even be a concern in view of Garcia. So I would say that to the extent that PNC had used his declaration to try to support that someone would have had a concern about bandwidth with Garcia, he did take it back. And where is the— Can you give us the page? Yeah. Go ahead. So this is— Can you give us the page size for that particular thing that you're saying was taking back the deposition from what you were just referring to? Yeah, so this is in the final written decision at appendix— Let's go to the actual page. Okay, let me grab the actual page. And this is actually—Your Honors may have seen there was an exchange of 28J letters yesterday and the day before, and we actually cited to these parts of the testimony in that letter as well. Is that the Honeywell stuff? Yes, Your Honor, yes. Okay. Okay, I apologize, Your Honor, that is not the right site. Oh, so this is—I'm sorry, one page earlier, 4999. 4999. The question was, was the Garcia process bandwidth-intensive? And he says, well, I wouldn't necessarily— Wait, wait, wait, wait, wait. Okay, where? What line? Line 16 is the answer. I wouldn't necessarily characterize it as bandwidth-intensive. And the board actually goes and cites additional testimony as well, which we did— Well, that's not saying there's no advantage to it. We're saying it's not bandwidth-intensive, so that was— So why is that taking back his testimony, that there's a motivation here? Well, if you don't have a problem to begin with, the idea that was put forth in the petition— So you can still do something because it's beneficial, even if it's not solving the problem. Sure, and then he does go on. The other equivocation that the board relied on as well is he then said, well, he didn't actually know, maybe you'd prefer to do it on the server. Where does he say that? Let's see. So Appendix 51-64, and there's a couple other examples, too. They're all throughout the deposition testimony here. He says at line 16, we discussed this earlier in the day, there are reasons why designers might want to work on the client. They might want to work on the server. Either option might make sense. And by the way, opposing counsel made a new argument earlier today that this error checking— Let's stick with this, all right? You can make that point. I promise I will bring it back to that. He suggested that this is all just about trying to figure out if someone forgot to sign the check, and why wouldn't you— No, no, no, no, no. Just stick with this, please. It's confusing. But, Your Honors, I do want to point out— No, just stick with this, and we'll let you—I'll give you time to make your point. But why is this taking back his testimony about the advantage? Well, this part, he's just equivocating. This is the portion that the board pointed to among several other places where he says— He says there are reasons you might do it one way and reasons you might do another, but there's still a motivation. There's no motivation to do it on the phone. Right. There could be in theory, but ultimately he didn't come forward with any reason to say that somebody would actually prefer that. And what I was about to get to— I thought he did testify to that. Your Honor, what I was about to get to is— Did he testify to that? He has very conclusory testimony, which is what the board cites and said was insufficient. So remember that this is a dependent claim. This is Claim 2 through 7 dependent and Claim 1. And PNC is making the suggestion, well, you could put the error checking wherever you want. Duplicate detection is a specific form of error checking called out in the patent. Remember their entire theory for Claim 1 depends on that error checking being done on the server. And so this idea, well, you could just do it wherever you want, that's not supported by their testimony. That wasn't found by the board correctly. And it's totally inconsistent with their theory with respect to the rest of the claim, which is that IPOSA is going to be doing this on the server. That was their whole combination for Claim 1. So I do think that's important. Okay. I think unless there are other questions. Judge Cunningham? I have one last question. Did you have any response to a Court of Counsel's argument where he explained that rather than just focusing on the one basis that occurred in your opening argument, there are actually three alternative bases. And so in theory you would need to win on each of those in order for you to win on this particular issue. Yeah. One of them was the one that Your Honor has discussed with him in great detail, which is not in their brief and is just legally incorrect. But what he tried to break out as multiple different arguments about different pieces of the check that might be used, they all suffer exactly the same problem that I identified in my argument, which is they are all things that we put evidence in the patent owner's response would be not expected to succeed because of skew, warp, and the other issues. And PNC during the proceedings below, and consequently the Board, just completely and totally ignored those problems. And the fact that the Board did not even go to the question of how would the skew or the warp impact the motivation and the expectation of success for this alleged combination on Claim 1, that applies absolutely equally however anyone wants to look at what the PNC theory was, whether it was the signature or the miker or something else that they're presenting to Your Honors today, whatever you want to characterize it as, you have this fundamental problem that the Board simply entirely ignored the finding that you'd have skew, warp, and other significant issues and did not incorporate that at all into their analysis. Okay. I think we're out of time. Thank you. Mr. Lanier, you have a minute. Thank you, Your Honor. I just wanted to provide a few record sites here that may respond to some of the things that Ms. Glasser said. Did Dr. Mowrey say there was a motivation to combine, and did he take it back? He did say there was a motivation to combine. He said there were multiple motivations to combine, and he did not ever take it back, Your Honor. And if it's helpful, the relevant portion of the petition on Claim 2 can be found at appendix pages 281 to 285, and Your Honors can see what the motivations to combine were there. They're all supported by Dr. Mowrey's testimony. His testimony is in the record, for example, at appendix pages 952 to 953 on this, and so I think those are relevant. It is not correct that Dr. Mowrey stepped back from his opinions that he – I'm not sure what word was used. What he testified and what the Board found is that there would be tradeoffs, and there would be reasons you might want to do it on the server, and there would also be reasons that he put forward in his declaration and that we put forward in our petition that you would want to do it on the device to avoid sending checks unnecessarily because you want to conserve bandwidth. The other thing I would point out, just to make sure that the record is clear, is a couple of times USA's counsel said that the bandwidth savings motivation was our only motivation to combine that was set forth in the petition. That's not accurate, and Your Honors will see that if you review page 72 of the red brief, for example. Happy to answer any questions about it. I know I only had a minute. Judge Cunningham, do you have any other questions? Thank you very much. Okay. Thank you, Your Honors. Thank both counsel. The case is submitted.